# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SANDRA LIFSCHITZ, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. |
| Plaintiff, ) | 08 Civ. 6394 (RMB) |
| vs. ) | |
| HEXION SPECIALTY CHEMICALS, INC., CRAIG O. MORRISON, and JOSHUA J. HARRIS, ) ) ) ) | |
| Defendants. ) ) | |

**LEAD PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF THE SETTLEMENT AND FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

## I.    PRELIMINARY STATEMENT

On January 11, 2010, after months of discovery and negotiations – including a mediation conducted by former United States District Court Judge Layn Phillips in which the parties argued the strengths and weakness of the claims as well as their respective views on damages – the parties signed a Stipulation of Settlement in which they agreed to settle this litigation for the payment of $18 million in cash.  Lead Plaintiffs moved for preliminary approval of the Settlement, which the Court granted on January 21, 2010.

In accordance with the requirements of the Preliminary Approval Order, a website, www.huntsmanshareholdersecuritieslitigation.com, was established on which various pleadings were placed, including the Stipulation of Settlement, the Preliminary Approval Order, and the Notice and Proof of Claim.  The Notice was sent initially to more than 5,800 addresses and a summary notice was issued three times on the PR Newswire.  Subsequently, the Claims Administrator mailed an additional 2,029 Notices to persons identified by nominees.  Through this notice process, class members were informed of the May 3, 2010 deadline for objections and requests for exclusion to be filed and the May 5, 2010 deadline for the filing of Proofs of Claim.

On March 3, 2010, Lead Plaintiffs filed detailed documentation supporting the Settlement and Lead Counsel filed their request for attorneys' fees and expenses with the Court.  Additionally, these filings were placed on the website giving Class members additional information to review.

Lead Counsel has received only one objection, which, as explained below, does not address the adequacy of this Settlement or the claims that have actually been filed in this action but, instead, speculates that this Settlement would be insufficient to compensate an entirely different, vastly larger class (including equity and bondholders of a different company) over a

1

time period expanded two years beyond the Class Period at issue here, based on a different theory of liability. No requests for exclusion have been received.

These factors are relevant to consideration of the fairness, reasonableness and adequacy of the Settlement and further support both final approval of the Settlement and the award of attorneys' fees and expenses.

## II.    ARGUMENT

### A.    The Settlement Should Be Approved

As set forth in the Memorandum in Support of Lead Plaintiffs' Motion for Final Approval of the Settlement, Plan of Distribution, and Certification of the Settlement Class and in Lead Counsel's Request for Attorneys Fees and Expenses, this Settlement is fair, reasonable and adequate under the governing standards in the Second Circuit and warrants final approval by this Court.

The notice program was extensive and satisfies due process. Class members and nominees were advised of all relevant information and deadlines through the settlement website, www.huntsmanshareholdersecuritieslitigation.com, internet publication on three occasions, and personal mailing of more than 6,829 Notices and Proofs of Claim. *See* Affidavit of Michael Miller, ("Miller Affid."), ¶¶2-5, 7. In addition, class members were advised of the toll free number available to them, 1-877-965-3300. *See* Notice.

The Claims Administrator is completing the processing of all of the claims received.[1] As of May 10, 2010, a total of 742 claims have been received, most of which were filed electronically. The Claims Administrator has processed 201 claims, of which four have been

---

[1] Claims are timely filed if they are received or postmarked by May 5, 2010. Thus, it is conceivable that additional claims might arrive in the next few days. Lead Counsel will provide an update at the May 18, 2010 hearing.

rejected for no loss or purchase in the class period, forty four are deficient for no proof/documentation of their shares, and 153 are valid with a recognized loss of $8,414,265 on 1,052,703 shares.[2] *See* Miller Affid., ¶9. As of now, the $18 million Settlement, if approved, will confer a benefit on valid claimants at approximately 40% of their losses, before any award of attorneys' fees and expenses. That is an extraordinary return in a class action settlement.[3] See *John C. Coffee, Jr., Accountability and Competition in Securities Class Actions: Why "Exit" Works better than "Voice,"* 30 Cardozo L. Rev. 407, 414 (2008) ("According to one well-known study, the ratio of securities class action settlements to investors' economic losses has ranged over recent years between two and three percent.")

Only one objection, described below, has been filed. That fact, too, supports a finding that the Settlement is fair, reasonable and adequate. "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 118 (2d Cir. 2005). *See also*, *Wright v. Stern*, 553 F.Supp.2d 337 (approving settlement even though 13 objections were filed out of 3,500 class members); *In re Paine Webber P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997) (where, three objection to substantive terms of settlement were filed, two of which were subsequently resolved, the court noted this is an "extremely favorable response.")

---

[2] Recognized Loss in this case was based on the drop in stock price upon the disclosure on June 18, 2008 that defendants sought not to proceed with the merger with Huntsman. *See* Notice, pages 9-10.

[3] This is assuming the same rate of valid claims and loss for those not yet processed as those processed.

Not a single request for exclusion from the Settlement has been received, further evidencing that the Settlement is fair, reasonable and adequate. Were the class members not satisfied with the Settlement, certainly one or more of them would have opted-out.

**B.    The Antonvich Objection Should Be Denied**

On April 30, 2010, Lead Counsel received an "Objection to Settlement" from Mark Antonvich (the "Antonvich Objection"), attached hereto as Exhibit "A." At the outset of the Antonvich Objection, Mr. Antonvich states that his objection is to the "grossly inadequate consideration given the egregious conduct involved and the massive losses sustained by Huntsman Corporation equity investors." (Antonvich Objection, page 1) The Antonvich Objection also requests that attorneys' fees be "reduced significantly given the actual amount of real attorney hours devoted to this lawsuit and the failure by such lawyers to expand the Class Period to cover additional damaged investors." (Antonvich Objection, page 1).

However, upon reading the entire Antonvich Objection, it becomes clear that Mr. Antonvich's concern is that this Settlement – a settlement for purchasers of Huntsman stock or traders in Huntsman options during the Class Period, May 9, 2008 through June 18, 2008 -- not impair a different claim that he states may exist for different persons (including for shareholders in a different company) in a different time period based on different facts. Antonvich's potential claim, which is based on a different legal theory, concerns purported side deals (the "side deals") allegedly entered into between defendant Joshua Harris ("Harris") and certain banks on or about July 12, 2007.[4] The Antonvich Objection calls this the "New and Different Class Action Claim." The time period for this purported "New and Different" claim is July 12, 2007 through June 15,

---

[4] These alleged side deals were discussed in the Texas trial of Huntsman's claim against the banks that were to provide the funding to Hexion for the merger. That lawsuit was settled. The Antonvich Objection includes quotes from that proceeding.

2009 – a full two years longer than the Class Period in this case and  a year after Hexion sought

to terminate the Merger, causing the drop in Huntsman's stock price which the Settlement seeks

to resolve.  The Antonvich Objection refers to this time period as the "Expanded Class Action

Period."

### 1.    The Antonvich Objection simply seeks clarification that the "New and Different Class Action Claim" for the "Expanded Class Action Period" is not released

The Antonvich Objection states, at page 1, that it is asking for clarification that the

Settlement does not release the "New and Different Class Action Claim" for "The Expanded

Class Action Period."  Thus, it is readily apparent that the Antonvich Objection is not really an

objection to the Settlement that is before the Court for final approval.  It does not argue that the

$18 million Settlement is not fair, reasonable and adequate for the settlement of the claims in this

litigation or for the Class Period covered by the Settlement.  Rather, the Antonvich Objection

appears to take the position that the Class Action must include the "New and Different Class

Action Claim" for "The Expanded Class Action Period" and that once you factor in that different

claim and the greatly expanded time period, the $18 million Settlement is not sufficient.[5]

(Antonvich Objection, p. 1).  However, the simple answer is that the "New and Different Class

---

[5] To the extent the Antonvich Objection complains that Lead Plaintiffs did not expand the Class Period back to July 12, 2007 and forward to June 15, 2009, it  is legally and factually misplaced. Lead Plaintiffs are not required nor able to bring claims on behalf of persons they do not represent or persons whose claims are not common to, or typical of Lead Plaintiffs' claims.  In addition, it is counterintuitive to argue that the Class Period must be expanded by years when the claim in the expanded time frame is different from the claim brought during the Class Period, arises out of different facts and involves different class members.  As a practical matter, the expansion of the class period would dilute the recovery of the members of the Class.  Because the Release in the Class Action does not include the release of the purported "New and Different Class Action Claim" for the "Expanded Class Action Period," the Settlement in no way impacts or impedes others, *i.e.* non-Class Members, from pursuing that claim.

Action Claim" and "The Expanded Class Action Period" are not part of the Settlement before the Court.

The Antonvich Objection, at page 6, attempts to support the "New and Different Class Action Claim" with evidence gleaned from trial transcripts in the Texas litigation: "As the evidence suggests, at the time the Merger Agreement and Financing Commitment letters were signed [July 12, 2007], both the Banks and Hexion/Apollo allegedly knew they did not contain all the terms as represented because they agreed secretly to different and additional material terms that were not disclosed to Huntsman or the public in Hexion's securities filings." That "New and Different Class Action Claim" for the "Expanded Class Action Period" is, as the Antonvich Objection recognizes, not the legal claim being settled in the Settlement of the Class Action.  The Released Claims being settled relate to the allegations in the Complaint that Defendants allegedly made material misrepresentations and omissions between May 8, 2008 and June 18, 2008, the Class Period, concerning their intention to walk away from the merger of Hexion and Huntsman.

In further support of the "clarification" the Antonvich Objection seeks, that the Released Claims do not preclude Hexion or purchasers of Hexion securities or purchasers of Huntsman securities after June 18, 2008 from pursuing any causes of action or preclude Hexion or purchasers of Hexion securities from pursuing any claims, the Antonvich Objection states, at page 5, that Hexion has suffered damages in the amount of $1,027,000,000 at the hands of Mr. Harris and the Hexion Board related to the alleged side deals which may give rise to such causes of action or claims.  If any such claims exist, however, they are separate and distinct from the matter at hand.  Purchasers of Huntsman common stock after June 18, 2008, or Hexion, or its shareholders, may have standing to pursue such claims, not purchasers of Huntsman common

stock between May 9 and June 18, 2008, on whose behalf the Class Action is brought.[6]  The

Settlement of the Class Action has no effect on post-June 18, 2008 Huntsman purchasers or on

Hexion or its shareholders.

The Antonvich Objection also complains that the price of Huntsman common stock fell

to $2.03 in February 2009.  That drop in Huntsman's stock price is not related to the disclosure

on June 18, 2008, the end of the Class Period, that Hexion was seeking not to go forward with

the merger.  Thus, if there is a claim arising out of Huntsman's stock price drop in February

2009, the Settlement of the Class Action in no ways impedes the pursuit of that claim.[7]

### 2.    Antonvich's Objection to the Attorneys Fees is General and Unsupported

The Antonvich Objection does not provide any support for its request that Lead

Counsel's attorneys' fees should be reduced because of "the actual amount of real attorney hours

devoted to this lawsuit and the failure of such lawyer to expand the Class Period to cover

additional damaged investors."   It appears that the sole basis for the objection is that Lead

---

[6] Mr. Antonvich states that he also owns Hexion equity in the form of "member units in Hexion
LLC," Antonvich Objection, page 2.  That equity position, the value of which is not disclosed by
Mr. Antonvich, suggests that Mr. Antonvich's true complaint arises out of the alleged loss of the
value of his investment in Hexion, a loss which is clearly not impacted by the Settlement of the
Class Action.

[7] Mr. Antonvich has known since the publication of the filing of the Class Action pursuant to the
PSLRA  in July 2008 and through numerous communications with Lead Counsel during the
course of the litigation of the Class Action, communications he initiated, that the Class Action
relates to the Class Period and the claim that defendants did not timely disclose their intention to
walk away from the merger.  Yet, Mr. Antonvich apparently never took any steps to pursue the
"New and Different Class Action Claim" for the "Expanded Class Action Period" he now argues
may exist.  Mr. Antonvich is also the former Executive Vice President and General Counsel of
Hexion, and it would appear from the tone of his that he may have an ulterior motive for
presenting the Objection to Settlement.  See Mr. Antonvich's resume which he had previously
sent to Lead Counsel, attached hereto as Exhibit "B."

Counsel did not expand the class period and the claims as Mr. Antonvich would like. However, as stated above, neither Lead Counsel nor Lead Plaintiffs was required to expand the class period or the claims to suit Mr. Antonvich's view of different claims relating to different time periods, arising out of different facts and damaging different people.

As reflected in the fee petition and supporting papers, the attorneys hours billed to the litigation were necessary to obtain the excellent result achieved and reasonable in the context of the litigation. These papers have been available on the website and were sent to Mr. Antonvich Additionally, Mr. Antonvich has communicated with Lead Plaintiffs' counsel on numerous occasions during this litigation and at no time discussed his supposed concerns with the hours devoted to the litigation nor with the length of the Class Period.

## III.    CONCLUSION

Accordingly, Lead Plaintiffs respectfully request that the Court deny the Antonvich Objection in all respects, approve the Settlement, Plan of Allocation, Requested Attorneys' Fees and Expenses[8] and enter the proposed Judgment and Order of Dismissal with Prejudice in connection with the Settlement proceedings.

Dated: May 10, 2010

**LAW OFFICES BERNARD M GROSS, P.C.**

_____/s/ Deborah R. Gross_____
**DEBORAH R. GROSS**
Suite 450, Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215-561-3600
Fax: 215-561-3000
***Lead Counsel for Lead Plaintiffs***

---

[8] During the months of March and April 2010, Lead Counsel spent an additional 12.25 hours, with a corresponding lodestar of $6,018.75 on the matter. Backup documentation on the lodestar and expenses is being submitted for *in camera* review.

# EXHIBIT "A"

Mark S. Antonvich, Esq.
1955 Vermont Street
Houston, Texas 77019

April 29, 2010

**Certified Mail**

**PLAINTIFFS' LEAD COUNSEL**
Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
Suite 450, Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107

Re:    Notice of Intention to Appear in *Lifschitz v. Hexion Specialty Chemicals, Inc., et al.,*
       Civil Action No. 08-6394.

Dear Ms. Gross:

Please be advised that I intend to attend the hearing on May 18, 2010 in support of my written objection to the settlement and attorney's fees.  Other than the attached opposition document, I do not intend to present exhibits or witnesses.

Sincerely,

Mark S. Antonvich

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


SANDRA LIFSCHITZ, Individually and on Behalf of
All Others Similarly Situated,
*Plaintiff,*

v.                                          Civil Action No. 08 Civ. 6394 (RMB)

HEXION SPECIALTY CHEMICALS, INC.,
CRAIG O. MORRISON, and JOSHUA J. HARRIS,    OBJECTION TO SETTLEMENT
*Defendants.*


**FILED IN CONNECTION WITH A JUDICIAL PROCEEDING, THIS
DOCUMENT IN NO WAY IS INTENDED TO DISPARAGE APOLLO OR
HEXION, OR ANY OF THEIR AFFILIATES, EMPLOYEES, OFFICERS,
DIRECTORS OR ADVISORS.**

Mark Antonvich is a member of this particular Class of Huntsman shareholders and has been
personally damaged (he purchased 500 shares on 6-11-08 at $21.14). He has standing.

The proposed settlement is grossly inadequate consideration given the egregious conduct
involved and the massive losses sustained by Huntsman Corporation equity investors.

The attorney's fees should be reduced significantly given the actual amount of real attorney
hours devoted to this lawsuit and the failure by such lawyers to expand the Class Period to cover
additional damaged investors, as noted below.

In addition, it must be made absolutely clear by this Court that the proposed settlement will **NOT**
foreclose future actions by Hexion LLC equity owners as well as Hexion and Huntsman
bondholders, who may have been damaged severely by the conduct of Hexion's Board and
Management, as detailed below from the evidence revealed in the Huntsman judicial
proceedings.

**NEW AND DIFFERENT CLASS ACTION CLAIM FOR MAKING KNOWINGLY
FALSE PUBLIC STATEMENTS AND EXPANDED CLASS ACTION PERIOD**

**An expanded Class Period exists that would include the period from 7-12-2007
(Initial Hexion Merger Announcement Press Release) to 6-15-2009 (Conroe Trial
Opening Where Josh Harris' Secret Side Deals With the Banks Were First
Disclosed Publicly In Open Court).**

1

Class Members would include Hexion Equity Holders and Bondholders (damage to publicly traded Hexion bonds down to as low as 8 cents (.08) on the dollar) and Huntsman Shareholders, including Mark Antonvich, who purchased additional Huntsman shares after June 18, 2008. Mark Antonvich also owns equity in the form of member units in Hexion LLC. Thus he has standing in an expanded Class Period and for other claims.

Significantly, this Class Period is much longer than the Lifschitz class action lawsuit, resulting in millions and millions more Huntsman shares traded and many more class members. Huntsman's "float" of publicly traded shares was in excess of 200 million shares, of which 3 to 4 million shares were traded daily.

Over 1.5 billion shares of Huntsman were traded from 7-12-2007 to the week of June 15th, 2009, when the alleged fraud committed by Josh Harris was first exposed to the public during the opening argument of Huntsman's trial against the Banks in an open courtroom in Conroe, Texas.

At the same time, over $800 million of Hexion's bonds (CUSIP: 428303AH4) were traded in the active public debt market.

Josh Harris, by virtue of his alleged secret agreements with the banks, apparently set in motion the series of events, including the Bank's efforts to enforce those secret promises and to restructure the transaction, which caused the merger to fail and Hexion to suffer catastrophic damage.

As a result of his position as a founding partner of Apollo, and director of Hexion, Apollo's ownership, through Hexion LLC, of Hexion, and active participation in the Huntsman merger and other Hexion activities, **Josh Harris has the power to influence and control and may have influenced and controlled, directly and indirectly, the decision-making and actions of Hexion with respect to the proposed Huntsman merger, and many other Hexion activities, including the filing of the financial reports to the SEC.**

As a direct and proximate result of Josh Harris' alleged wrongful conduct, he may be liable for the damages he caused pursuant to **Section 20 (a) of** the Securities and Exchange Act:

### Section 20 of the Securities and Exhange Act-- Liabilities of Controlling Persons and Persons Who Aid and Abet Violations

#### Section 20 (a) Joint and Several Liability

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and

did not directly or indirectly induce the act or acts constituting the violation or cause of action.

**Section 20 (e) Prosecution of Persons who Aid and Abet Violations**

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 21(d), any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

**Based on the evidence already presented in several judicial proceedings detailed below, it appears that the Hexion Specialty Chemicals Inc. ("Hexion") Board (led by Josh Harris of Apollo) and Senior Management (led by Craig Morrison) engaged in willful misconduct and in a fraudulent manner in connection with the failed Huntsman merger, which has resulted in massive damage to both Huntsman and Hexion stakeholders in the billions of dollars.**

Despite spending millions of dollars on high priced lawyers, the courts in Delaware and Texas already have found, based on the "**overwhelming evidence**," that the Hexion Board and Senior Management witnesses were not credible and did not act in good faith in seeking to terminate the Huntsman merger.

As noted by Judge Lamb of the Delaware Chancery Court:

> **IN THE FACE OF THIS OVERWHELMING EVIDENCE, IT IS THE COURT'S FIRM CONCLUSION THAT BY JUNE 19, 2008 HEXION HAD KNOWINGLY AND INTENTIONALLY BREACHED ITS COVENANTS AND OBLIGATIONS UNDER THE MERGER AGREEMENT.**

For the reasons detailed below, the court concludes that Hexion has engaged in a knowing and intentional breach, and that the liquidated damages clause of section 7.3(d) is therefore inapplicable.

Thus a "knowing and intentional" breach is a deliberate One--a breach that is a direct consequence of a deliberate act undertaken by the breaching party, rather than one which results indirectly, or as a result of the breaching party's negligence or unforeseeable misadventure.

Given the court's conclusion that a "knowing and intentional" breach must be the

3

deliberate commission of an act that constitutes a breach of a covenant in the merger agreement, **Morrison's testimony makes clear that a knowing and intentional breach by Hexion had occurred by June 19, 2008**.

Rather, Hexion's utter failure to make any attempt to confer with Huntsman when Hexion first became concerned with the potential issue of insolvency, both constitutes a **failure to use reasonable best efforts to consummate the merger and shows a lack of good faith.**

Rather than being a diligent party making all necessary efforts to obtain antitrust clearance, come "hell or high water," the court was left with the impression that Hexion had, since May or June, been dragging its feet on obtaining that clearance, pending the outcome of its attempts to void the transaction, **in contravention of its obligations under the merger agreement.**

As also noted by The Court of Appeals, Ninth District of Texas at Beaumont (NO. 09-08-443 CV):

"The Banks understate the quality of the evidence developed at the temporary injunction hearing… For instance, the trial court heard evidence that would allow it to reach the conclusion that terms of the Banks' commitment were material in inducing Huntsman to abandon its merger under a prior agreement with another entity and enter into the merger agreement with Hexion. The commitment letter states that the obligations of the financing sources to fund the commitments are not subject to any conditions other than as set forth in the commitment letter. The merger agreement required Hexion to keep Huntsman informed with respect to all material activity concerning the status of the financing. Yet Huntsman produced evidence that the Banks and Apollo had an **undisclosed agreement from the outset to vary from the terms of the commitment letter**. The Banks claim Huntsman failed to demonstrate that Apollo and the Banks reached a meeting of the minds on a course of action at their April 2008 meeting in which the Banks proposed a restructuring of the supposedly "tight" financing commitment. **Huntsman showed the trial court that Hexion altered its course of conduct after that meeting and took affirmative steps that were intended to avoid fulfilling the terms required by the merger.**

We also find unpersuasive the Banks' arguments regarding Apollo's status as Hexion's parent. Huntsman's claims against the Banks are not wholly dependent on the alleged **conspiracy with Apollo**, but include claims that the Banks directly interfered with Huntsman's merger contracts. Furthermore, the issue of whether

4

Hexion and Apollo operate as a single business enterprise was not established in the trial court."

## DAMAGE TO HEXION EQUITY

If proven, the conduct by Josh Harris and the failure of the Hexion Board to properly police him directly caused the damage that now has been recognized officially in the Hexion financial statements **of $1,027,000,000 in merger termination and settlement costs.** See 2009 10K for the latest disclosed Financial Statements.

### HEXION'S ALLEGED KNOWINGLY FALSE PUBLIC STATEMENTS INCLUDE THE FOLLOWING:

"The transaction is **fully financed** pursuant to commitment from affiliates of Credit Suisse and Deutsche Bank." See **7-12-2007 Hexion Press Release and 8K**;

"The transaction is **fully financed** pursuant to commitments from lenders, subject to certain customary conditions." "Lenders have committed to **fully finance** this acquisition when the transaction closes…" See **Hexion 2007 10Q for 2nd Quarter**

"The transaction is **fully financed** pursuant to commitments from lenders, subject to certain customary conditions." See **2007 Hexion 10K**

**The language above is consistent with the statements made by Apollo to induce Huntsman:**

"As your financial advisors have agreed with us, our financing commitments are of the highest quality and strength available in U.S. markets. Credit Suisse is the leading lender in this industry and to private equity sponsors generally. They have to all of their knowledge, never failed to fund a commitment when required to do so… "To quote one of your advisors, these papers are, quote, **rock solid**." **Our proposal is firm and fully financed.**"

This may have been a material representation at the time it was made in order to induce Huntsman to break its pending deal with Basell and agree to the merger with Apollo/Hexion.

**Fraud is defined as:**

a false representation of a past or existing material fact, when the false representation is (A) made to a person for the purpose of inducing that person to enter into a contract; and (B) relied on by that person in entering into that contract.

**The evidence suggests that the merger was never "fully financed" by the Banks as represented by Apollo, Hexion and the Banks**. If so, the financing was not "rock solid" but rather it was "quicksand," which would later consume the entire merger.

In addition to deceiving Huntsman, for which Hexion already has been found liable in the Delaware Chancery Court, Hexion's actions may have operated as a fraud or deceit on purchasers of Huntsman's common stock and the Huntsman and Hexion bonds. When Hexion's alleged prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Huntsman common stock fell precipitously as the prior artificial inflation came out (from approximately **$21 per share on** 6-18-2008 to **$12** on 6-19-2008, and then as low as **$2.03** in February, 2009).

The Hexion bondholders suffered damages as well as the price of the Hexion publicly traded bonds plummeted to as low as 8 cents on the dollar **(.08)**.

**As the evidence below suggests, at the time the Merger Agreement and Financing Commitment Letters were signed, both the Banks and Hexion/Apollo allegedly knew they did not contain all the terms as represented because they agreed secretly to different and additional material terms that were not disclosed to Huntsman or the public in Hexion's securities filings. If true, this is Fraud.**

# EVIDENCE FROM JUDICIAL PROCEEDINGS TO DATE

A.    **Secret Funding Gap**

See **Epley Deposition** (Deutsche Bank Senior Credit Official) at Page 30-32:2-10:

" . . . I heard that the price was raised to 28. To my knowledge, there was no discussion of the source of that incremental money."

"And in my mind, I didn't have a conclusion whether that would come from debt or incremental equity. And we would wait to see, you know, what direction was -- was requested by the client."

"And from and after that point through to the date the commitment letter was signed, were you asked to extend additional debt to cover that $250 million price increase?"

"No, I don't believe so. No."

**"And you did not, in fact, extend additional debt to cover that $250 million price increase?"**

**"No, we didn't."**

"And, so, as of the time the merger agreement was signed with Huntsman, the committed financing was, in your mind, arithmetically $250 million less than the consideration required to close the merger?"

"Answer: If what you're asking is was
there a gap -- since they were paying more money, was there a gap?
Yes."

Question: "...just to cure the objection, when the merger agreement was signed, the amount of the consideration to be paid exceeded the amount of the committed debt?"
Follow-up question: "Is that right?"
Answer: "That's my understanding."

See **Zaken Delaware Trial Testimony** (Hexion Board Member and Apollo Partner) at 230:

"We did not contemplate investing equity into this transaction. We secured debt commitment letters from Credit Suisse and Deutsche Bank to effectuate the **full purchase price** requested for this transaction."

See **Zaken Delaware Trial Testimony** at 321-322:

Q. "I misunderstood. I thought that's what this meant, that you might **exceed your financing and have to make an equity requirement.** Did I misread that?"
A. "You didn't misread that, no."

See **Zaken Delaware Trial Testimony** at 343-345 (Discussing Exhibit 2389 DB Summary of the Original Commitment in June 2007):

Q. "All right. You'll see over in the left-hand margin there's an annotation that this 'Assumes original Apollo new equity assumption of $170 million per Apollo/DB discussions in June 2007.' You see that?"
A. "I see that."

Q. "All right. Here down in the bottom left-hand corner there's an annotation that the 'Revised proposal assumes $500 million of new Apollo equity **versus DB original assumption of $170 million.**' You see that?"
A. "I do."

See **Conroe Trail Transcript, Deutsche Bank Emails (Ms. Chang to Mr. Tawry)**

"Do we know how they want us to deal with the fact that neither us, nor Credit Suisse, nor both of us combined, can underwrite the entire check?"

7

See **Conroe Trial Transcript, Peter Huntsman Testimony, Referring to Exhibit 22 and 32**

> E-mail exchange, internal, at Deutsche Bank, the July 12, the next day, Martin Arzac to -- copy to Christopher Towery, Liz Chang, and others. Do you see that? MR. HUNTSMAN: Yes. MR. GIBBS: "Looks like the 28 per share, no sale, Apollo puts in 375 million. But if the sale is completed, looks like Apollo still puts in no equity, exclamation mark. Are we missing something, question mark." Do you see that? MR. HUNTSMAN: I do. MR. GIBBS: Turning over, later in the string, do you see Liz Chang's response, managing director of leverage finance for Deutsche Bank Securities? MR. HUNTSMAN: "We are doomed." MR. GIBBS: Were you aware, as of this point in time, the Deutsche Bank's principals held that view of this transaction? MR. HUNTSMAN: No, I did not.

See **Conroe Trial Transcript, Referring to Plaintiff's Chang Exhibit 44**

> LAWYER: What Mr. Paasche had said, continuing in his e-mail, is, "If you were talking to the right person at Apollo, I'd remind them of likely need for help on changes, including caps, and that this only increases likelihood we'll need to ask." Did you see that? MS. CHANG: Yes, it's an e-mail. LAWYER: And what Mr. Paasche is saying is that by bumping it up from 25.25 to $26 a share, it increases the chance that Deutsche Bank is going to turn to Apollo and say we need you to live up to your verbal assurances. Right? LAWYER: Or to call them on their verbal assurances. MS. CHANG: It -- to ask them to make changes. LAWYER: Which you understood was part of the verbal assurance. MS. CHANG: Yes, I guess it's -- call them on their verbal assurances is a -- LAWYER: To ask them to honor their word. MS. CHANG: Okay, to ask them to fulfill their verbal assurances.

**B.    Secret Agreement to Credit Asset Sales to Reduce Draw on Financing**

See **Price Deposition** (Credit Suisse Banker and Key Relationship Partner with Apollo) at 142; **Zaken Delaware Trial Testimony** at 351-352:

> Q. All right. Let me ask you to look at Mr. Price's deposition. I've given you a copy of that. Beginning at page142.
> A. Yes.
>
> Q. All right. And here beginning on line 10 he's asked a question, **"Your belief when you entered into the commitment letter was that if there were such divestitures they would reduce the financing commitment?"**
> He says, **"Yes, that was our business understanding that projections reflect that and the commitment letter has a prospective sweep of cash**

8

from asset sales to reduce debt commitment. So the question is one of
timing as to the date of closing of this merger versus the date of
closing of the various divestitures."

"Q. How would you benefit from it at the closing date?"
"A. Because we would expect them to draw less of a term loan to the
extent they received a billion dollars of assets."

Q. Do you see that?
A. I see that.

**Price Delaware Trial Testimony** at 767-768; 795:

Q. Let's talk about that. In your merger, you were going to have -- in this
contemplated merger, there were going to be roughly a billion dollars of
potential divestitures. Is that right?
A. That's right.

Q. It was your expectation, when you signed, that asset sale proceeds
would reduce the funding available under the commitment letter?
A. That's correct.

Q. Before the merger agreement was signed, did anyone tell
Huntsman that you had that understanding?
A. Not to my knowledge.

Q. Now, giving effect to that understanding would reduce, if it were
reduced dollar for dollar, roughly a billion dollars of liquidity
available to the company post-closing. Right?
A. It would, yes.

Q. No one told Huntsman that, so far as you know?
A. As far as I know, no.

Q. And you had approached this commitment before it was ever
signed with your business understanding being that the asset sales
would be credited; true?
A. True, yeah.

See **Conroe Trial Transcript, Referring to Plaintiff's Exhibit 1175**

MS. PATRICK: And what was the total amount of the commitment
reflected in the commitment letter? Remind us about it, please. MR.
MIMMS: The total amount for both banks was $15,350,000,000. MS.
PATRICK: And what is the total commitment amount that Credit Suisse is
reflecting here? MR. MIMMS: If you look down in that -- the total about

9

halfway down the page is $14,697,000,000. MR. MIMMS: Correct. MS. PATRICK: Why is it different, Mr. Mimms? MR. MIMMS: Well, the -- the testimony by Mr. O'Hara, a senior Credit Suisse person, indicated that they had reduced that amount to reflect items such as the sale of assets and other similar proceeds. So they have reduced the amount that they assume that they would fund. MS. PATRICK: So they reduced the commitment amount in their mark-to-market records to reflect an expectation that they would get credit for asset sales? MR. MIMMS: Correct. MS. PATRICK: Was that in the commitment letter? MR. MIMMS: No, it was not.

C.   **Secret Agreement to Insulate Banks from Market Losses and Assume Syndication Risk**

See **Price Deposition** 114:22-115:15, PX23:

(Cole Email recounting that Apollo "said all of the right things, **trust us, we won't leave you hung**, we've priced deals through the caps in the past, we gave CS the same assurances and they are fine.")

See **DelawareTrial Exhibit** 2059 and **Price Delaware Trial Testimony** at 751-753:

Q. Now, let's talk a little bit about your relationship with Apollo. We are done with that. Apollo is a very important Tier 1 client of Credit Suisse. Is that right?
A .That's right.

Q. And you are the primary client contact for Apollo. True?
A. True.

Q. And you work as partners with Apollo on this and many other deals. Right?
A. Right.

**Q. And Apollo, indeed, before you signed the commitment letter in this transaction, promised to take care of Credit Suisse on this deal. True?**
**A. True.**

**Q. You rely on them to take care of you in this and many other deals. Right?**
**A. Yes.**

Q. And let's just take a look at Defendant's Exhibit 2059. Mr. Price, you and I have made cameo appearances in this case. We have different exhibit numbers.

10

A. Okay. I have got that.

Q. This is the e-mail that you sent to Mr. Harris and Mr. Kleinman and Mr. Zaken shortly before the commitment letter was executed. True?
A. True.

Q. In that commitment letter, you said, "We are not going to attempt to retrade our caps eventhough the market has melted down this week . . . ." Right?
A. I see that.

Q. ". . . and even though retrades of caps have become popular with some of our competitors over the last two days." Right?
A. Right.

Q. "We trust you to work with us as partners as always." Right?
A .Right.

Q. And you were asking that they reward your, quote, aggressive and constructive support of Hexion on this deal over the last several years. Right?
A. That's correct.

**Q. And Mr. Harris's response was, "Got it. We always take care of you." Right?**
**A. Yes.**

See **Price Delaware Trial Testimony** at 765-767:

Q. Now, let's look -- I want to change topics from that solvency analysis, and talk about the ways in which Apollo has promised to help. Okay?
A .Okay.

Q .We saw earlier a comment from you in the e-mail about your not going to try to retrade your caps now. Do you remember that?
A. I remember that.

**Q. But you did tell them that the market had melted down, and you expected them to work with you as partners if you needed it. True?**
**A.True.**

**Q. And one of the expectations you had about how they would work with you as partners was that they would be willing to consider raising the caps, if that was necessary, to market the transaction?**
**A. Yes.**

11

Q. And in fact, they have raised caps for you before, on other transactions, haven't they?
A.They have.

Q. That was your understanding before the commitment letter was signed. Right?
A. Right.

Q. And if those caps were raised, it would increase pressure on the borrower and create additional liquidity demands. Right?
A. Yes.

Q. Did anyone tell Huntsman, before the merger agreement was signed, that you had this understanding with Apollo about raising the caps?
A. No, because the understanding, as we discussed earlier, was subject to not changing the funds available to close the deal. We imagined once the deal is closed, Huntsman would lose interest.

See **Delaware Chancery Trial Exhibit** 2120:

"Malcolm has had explicit conversation with Apollo that he doesn't want to retrade the caps, but that they do not reflect the current market conditions. **Apollo agreed that they will work with us as partners in whatever market we are in when the deal comes.**"

See **Zaken Delaware Trial Testimony** at 349:

**"I remember a conversation with Credit Suisse where we said we would work with the banks, yes.**

See **Price Memorandum to Brady Dugan**, (CEO of Credit Suisse)

"Credit Suisse is trusting Apollo to deliver on its commitment to Credit Suisse. Credit Suisse underwrote $7 billion dollars of the deal based on an explicit handshake that Apollo would get Credit Suisse down to $3 and a half billion within days and Apollo made a commitment to look after Credit Suisse on the bank deal pricing."

See **Stephen Wade Memorandum to Thomas Gahan of Deutsche Bank**

"Wanted to reiterate our position on Apollo/Huntsman. This was a difficult transaction given the size of our commitment (EUR 4.1 billion) and the declining state of the market. Nevertheless, we agreed to move

12

forward largely on the commitment you received from Josh Harris, a founding member of Apollo, to do the following (i) work with us on the covenant issue, and (ii) to use their relationships to sell us down to 15% (EUR 1.24 billion)"

See **Conroe Trial Transcript, Referring to Plaintiff's Exhibit 2452**

MR. MIMMS: Yes. This is the credit risk management analysis. These are the mark-to-market accounting summaries prepared by Deutsche Bank. It summarized the losses that they are reporting in the analysis they're doing for their commitments. MS. PATRICK: And what does it indicate about whether Deutsche Bank is recognizing losses on the commitment as the credit markets decline? MR. MIMMS: Well, the -- the language below the table there, you see indicates that the valuation was determined with consideration of the binding side letter with the -- with the sponsor, Apollo. So what that is indicating that they -- that Deutsche Bank is not performing their calculations strictly based on what is reflected in the commitment letter, but they are adjusting those calculations to reflect the side agreement that they have with Apollo. MS. PATRICK: So they aren't recording losses because of an agreement with Apollo? MR. MIMMS: That is correct. MS. PATRICK: What did you, from their documents, understand they believed the agreement was? MR. MIMMS: Well, that the -- the agreement, as indicated in this document and in other documents, was that Apollo would make changes to the commitment in order to reduce the losses that the bank would have to -- to protect the banks. MS. PATRICK: Is this just a one-time document, Mr. Mimms, somebody kind of got out of line and wrote this down one time? Is that the only time you see that in Deutsche Bank's documents? MR. MIMMS: No, I see it every time as well.

See **Conroe Trial Transcript, Referring to Plaintiff's Exhibit 66**

That's a prep memo before that meeting according to Counsel, by Malcolm Price to prepare those higher-ups to meet with Leon Black. Do you see that? MR. HUNTSMAN: I do. MR. GIBBS: Now, it says by way of background, Apollo was one of Credit Suisse's top clients paying approximately $140 million in fees in 2007, and $91 million in 2006.

MR. GIBBS: And with respect to the message that was to be delivered about the top ranks at Credit Suisse to Mr. Black and Apollo, do you see the bullet points down below? MR. HUNTSMAN: Yes.  MR. GIBBS: Apollo was a special relationship for Credit Suisse. Do you see that? MR. HUNTSMAN: I do. MR. GIBBS: Credit Suisse has stepped up more than any other bank to support Apollo. Were you aware of that? MR. HUNTSMAN: Yes. MR. GIBBS: Seven billion dollars commitment to Hexion confirms single largest commitment by far. Were you aware that

your -- Apollo contract was Credit Suisse's single largest commitment by far? MR. HUNTSMAN: No. MR. GIBBS: They had a $180 million direct investment in Apollo. MR. HUNTSMAN: I -- I -- yes, I didn't know that.

MR. GIBBS: It says, "Credit Suisse is trusting Apollo to deliver on its commitment to Credit Suisse when Hexion comes to market." Do you see that? MR. HUNTSMAN: I do.

MR. GIBBS: And then, this is what I get down to what I wanna ask you. Credit Suisse underwrote $7 billion with the deal based on an explicit handshake that Apollo would get CS down to $3.5 billion within days, which is yet to happen. Do you see that? MR. HUNTSMAN: Yes, I do. MR. GIBBS: Were you aware of any such explicit handshake that Apollo had ever been to as of July the 12th, '07 when they signed this deal? MR. HUNTSMAN: No, I was not.

MR. GIBBS: It says, "Apollo commitment to, quote, look after CS, close quote, on bank deal pricing as CS held the line against the Deutsche Bank retrade attempt." Do you see that? MR. HUNTSMAN: Yes.

MR. GIBBS: "Finally, together with Apollo and Credit Suisse can do great business together during the down cycle. CS will continue to focus its best resources and creativity on Apollo." Now, were you aware at any time after the end of January and prior to finding out about this memo that Credit Suisse was going to a meeting to make those points to Apollo in that time frame about your deal? MR. HUNTSMAN: No, I was not. MR. GIBBS: Were you aware that there was any commitment by Apollo to, quote, look after Credit Suisse, close quotes, on bank deal pricing? MR. HUNTSMAN: No.

See **Conroe Trial Transcript, Referring to Plaintiff's Exhibits 40 and 41**

LAWYER: And you could see a situation -- for example, did you ever hear Apollo promised Deutsche Bank that they were not going to lose money on the deal? MS. CHANG: I think one of the documents you showed me said it would not be hung, which I interpret that as we would not be stuck -- Deutsche Bank would not be stuck holding the commitment, which implies losing money. LAWYER: All right. So you understood it in the real time, at least, that Deutsche Bank had a verbal assurance that it was not going to lose money. MS. CHANG: That's what the conversation had been relayed to me. LAWYER: By Deutsche Bank officials? MS. CHANG: By members of the Deutsche Bank team. LAWYER: When you received this, Exhibit 40, did you understand that one of the reasons Deutsche Bank went forward and issued a Commitment Letter was based upon the verbal assurances of Apollo? MS. CHANG: Yes.

14

## IMPROPER PERSONAL BENEFITS

See **Apollo Amended S-1** filed 8/12/08:

> In connection with Apollo's IPO and referring to fees it expected, Apollo states, "Approximately **$193.0 million** related to transactions entered into prior to July 13, 2007 but not consummated as of such date, the *majority of which relates to a pending transaction with respect to Hexion*, which transaction is contingent upon the close of the merger of Huntsman with Hexion, a portfolio company of Funds IV and V."

This appears to be a massive, undisclosed fee to Apollo that would have inured solely to Josh Harris and his partners in contravention of the Operating Agreement. Apollo was seeking the **$102,000,000** fee at the very time Hexion itself was struggling financially, as noted below.

See **Morrison Delaware Trial Testimony** at 115-116:

> Q. This is a -- an e-mail from you to Judy Sonnett. Is that correct?
> A. Yes. She is our EVP of human resources.
>
> Q. Okay. And here you are talking about the difficulties that Hexion is having financially. Correct?
> A. Yes. That is correct.
>
> Q. And what you are talking about are some of these levers we have talked about, that you are going to have to pull to try to address that situation.
> A. Yes.
>
> Q. One of them would be cutting out 23 million from the SG&A budget?
> A. Yes. That's correct.
>
> Q. Another one is suspending dividends?
> A. This was referring just to myself.
>
> Q. Yourself. Okay.
> A. That was not anybody else.
>
> Q. Fine. Down at the bottom you talk about a 3 million-dollar annual Apollo fee. Do you see that?
> A .Yes.
>
> Q. And this is a fee to which Apollo is contractually entitled? Is that right?
> A. Yes. That's correct.

15

Q. But the board is entitled to suspend it?
A. Yes. They could.

Q. Okay. And you thought that it was prudent to ask the board to stop the 3 million-dollar annual Apollo fee in light of Hexion's current economic situation?
A. Yes, I did.

Q. And did you ask the board for that?
A. I spoke informally with Jordan Zaken, but we haven't gotten approval on this yet.

Q. That is still pending?
A. Yes.

Q. You believe that would be in the best interests of Hexion, for the board and for Apollo to agree with?
A. Yes.

Q. Do you expect they will act in the best interests of Hexion?
A. I would think so.

See **Carter Delaware Trial Testimony** at 179:

Q. Indeed, **Apollo sprung that $100 million fee on you at the last minute, didn't they**?
A. I wouldn't say "sprung." I knew that we had a management agreement that allowed Apollo to bill a management fee. **I had not had any discussions with Apollo on how much that was going to be.**

Q. And they just phoned you up and told you it was going to be $100 million; right?
A. They didn't actually phone me up. But I think in a meeting they indicated, since that was actually the percentage calculation.

Q. On your deposition, you didn't remember who told you or how it was calculated.
A. You're absolutely right. Because in my deposition I couldn't recall that there was a percentage in the agreement. I've since gone back and read the agreement to determine there's a percentage in it.

Q. Well, indeed --
A. You're right. I couldn't recall if there was a percentage or not.

16

Q. Indeed, you were their chief financial officer and you thought that they had a right to arbitrarily set that fee because you thought they owned 100 percent of Hexion, didn't you?

A. I may have said it -- I probably did say in my deposition they own 100 percent of Hexion. I'm clearly aware they don't own 100 percent of Hexion. Obviously, as a manager, I own part of Hexion. They clearly controlled Hexion, yes.

Q. They have outside shareholders, don't they? They have people who own 8 percent of the stock beyond the management of people like **SHELL and others**?

See **Morrison Delaware Trial Testimony** at 8-9:

Q. When was Hexion formed?

A. That was May of 2005 through the merger of four companies.

Q. And what's the relationship between Hexion and Apollo?

A. Apollo is the primary shareholder owning over 90 percent of the shares for Hexion.

Q. On an operational basis and a strategic basis, what's the relationship?

A. Apollo serves in a board capacity, in the sense as a traditional board would, **as well as in a business development role. They have a lot of expertise in deal making and a lot of contacts on Wall Street, so they also serve a business development role for us.** Jordan and I had agreed, as was the normal customary process, because we were competitors and because I was also leading the integration process, I did not feel it was appropriate for me to personally go require more information on these sort of details. **And so Apollo normally took the lead on those contacts with Huntsman and that was agreed upon in this case**. He contacted Huntsman.

See **Morrison Delaware Trial Testimony** at 62-63:

Q. Why do you say that you were highly incentivized to do this deal?

A. I think the opportunity to run one of the largest specialty chemical companies in the world was very attractive certainly to our management team and I would assume also to the Huntsman management team that I had interacted with. **The second thing was we had a financial incentive.** The Hexion management team, shortly after closing, would receive a payment of **35 million** across a group of managers. So financially we had a short-term payout and long-term -- if we were to hit our base model that we had projected, there would have been a very significant upside, well above that amount in the out years. So we were highly motivated both from just operating a business of that size and scale, as well as a monetary payout.

see **Morrison Delaware Trial Testimony** at 94-95:

> Q. Let's look back at the contract. You mentioned the contract. Again, JX 1. Let's look at 5.12(b). And let's go down toward the -- yes. Here we go. Right there. This is out of 5.12(b). **Hexion, without the written consent of Huntsman, cannot take any action that would be reasonably expected to materially impair, delay or prevent the financing contemplated by the commitment letter. Correct?**
> A. Yes.
>
> Q. And you are aware of this obligation. Correct?
> A. Yes.

**Delaware Chancery Court Opinion:**

> For the reasons detailed below, the court concludes that **Hexion has engaged in a knowing and intentional breach**, and that the liquidated damages clause of section 7.3(d) is therefore inapplicable.
>
> Thus a "knowing and intentional" breach is a deliberate
> One--a breach that is a direct consequence of a deliberate act undertaken by the breaching party, rather than one which results indirectly, or as a result of the breaching party's negligence or unforeseeable misadventure.
>
> Given the court's conclusion that a "knowing and intentional" breach must be the deliberate commission of an act that constitutes a breach of a covenant in the merger agreement, **Morrison's testimony makes clear that a knowing and intentional breach by Hexion had occurred by June 19, 2008**.
>
> Rather, Hexion's utter failure to make any attempt to confer with Huntsman when Hexion first became concerned with the potential issue of insolvency, both constitutes a **failure to use reasonable best efforts to consummate the merger and shows a lack of good faith.**
>
> Rather than being a diligent party making all necessary efforts to obtain antitrust clearance, come "hell or high water," the court was left with the impression that Hexion had, since May or June, been dragging its feet on obtaining that clearance, pending the outcome of its attempts to void the transaction, **in contravention of its obligations under the merger agreement.**
>
> In the face of this **overwhelming evidence**, it is the court's **firm conclusion** that by June 19, 2008 **Hexion had knowingly and intentionally breached its covenants and obligations under the merger agreement**.

18

**POTENTIAL FEDERAL SECURITIES AND EXCHANGE ACT ISSUES FOR HEXION, APOLLO, JOSH HARRIS AND THE BANKS**

A.    Hexion's and Apollo's Potential Violations of Sections 10(b) and 20(a) of the Securities and Exchange Act and SEC Rule 10(b)-5.

As the evidence above suggests, it appears that at the time the Merger Agreement and Financing Commitment Letters were signed, both the Banks and Hexion/Apollo knew they did not contain all the terms as represented because they allegedly agreed secretly to different and additional material terms that were not disclosed to Huntsman or the public in Hexion's securities filings.  If true, this would be a violation of the Federal Securities Laws.

      1.    Josh Harris and Hexion Knowingly Filed the Statements Regarding the Huntsman Merger Financing in Hexion's 8K, 10Q and 10K Noted Above.

In connection with the Huntsman merger, the parties above may have disseminated false and misleading statements, and failed to disclose material facts, as noted above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

      2.    The Bank's Mark-To-Market Calculations And Public Disclosures Were Fraudulent In That They Were Made On The Basis Of The Secret Side Deals With Josh Harris.

In connection with the Bank's public disclosures, the Bank's may have disseminated false and misleading statements, and failed to disclose material facts, as noted above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**Rule 10b-5 promulgated pursuant to Section 10b of the 1934 Securities and Exchange Act**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange:

      1.    To employ any device, scheme or artifice to defraud;

2.  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

3.  To engage in any act or practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**C.  SOX 906**

SOX 906 requires that each periodic report that contains financial statements must be "accompanied" by a statement by the CEO and CFO (who may jointly sign a single such statement), to the effect that such report fully complies with the requirements of the Exchange Act and that the information contained in the report fairly presents the issuer's financial condition and results of operation.

A CEO or CFO found to have knowingly violated SOX 906 can be punished with a $1 million fine and 10 years in prison; willfulness increases penalties to $5 million and 20 years.

**D.  SOX 302(a)**

SOX 302(a) requires that the SEC adopt rules requiring the CEO and the CFO of a "reporting" company (a publicly held company which files periodic reports under the
Securities Exchange Act of 1934 ("Exchange Act"); for all intents and purposes, this
encompasses all public companies) separately to certify in each quarterly (10-Q) and annual (10-K) report that, based on knowledge: such report does not contain an untrue statement of material fact or omit to state a material fact necessary to make the statement made not misleading (the Rule 10b-5 standard); and the financial statements and other information in the report fairly present in all material respects the financial condition and results of operation as of and for the periods presented. SOX 302 also requires that certifying officers confirm that they themselves are responsible for establishing and maintaining "disclosure controls and procedures" and that they have designed disclosure controls and procedures to ensure that material information which must be included in SEC filings is in fact made known to them.

20

**IN WITNESS WHEREOF,** dated April 29, 2010.

**MARK S. ANTONVICH**

_____

1955 Vermont Street
Houston, Texas 77019
281-414-3866

Mailed Certified Return Receipt to:

**PLAINTIFFS' LEAD COUNSEL**
Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
Suite 450, Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107

21

**IN WITNESS WHEREOF,** dated April 29, 2010.

**MARK S. ANTONVICH**

_[signature]_

1955 Vermont Street
Houston, Texas 77019
281-414-3866

Mailed Certified Return Receipt to:

**PLAINTIFFS' LEAD COUNSEL**
Deborah R. Gross
Law Offices Bernard M. Gross, P.C.
Suite 450, Wanamaker Bldg.
100 Penn Square East
Philadelphia, PA 19107

21

# EXHIBIT "B"

**MARK S. ANTONVICH**

1955 Vermont Avenue
Houston, Texas 77019

Tel: (281) 414-3866
mantonvich@aol.com

## PROFESSIONAL EXPERIENCE

**VINMAR INTERNATIONAL, LTD.,** Houston, Texas                    **2007-Present**

**Vice President and General Counsel** for a $4 billion international fuels, plastics and chemicals trading business with 30 sales and distribution offices located worldwide. Serve as the Chief Legal and Compliance Officer and Corporate Secretary.

- Provide legal support to all aspects of the domestic and international businesses
- Developed and implemented global legal compliance program with strong FCPA and export emphasis
- Provided In-Person FCPA Training in Russia, Nigeria, India, Mexico, Turkey, Korea, China, Dubai
- Hired to manage federal criminal investigations and civil trade secret litigation

**LAW OFFICES OF MARK S. ANTONVICH,** Houston, Texas              **2006 to 2007**

After completing successful integration of Hexion Specialty Chemical's legal function, returned to Houston to provide legal and compliance consulting services to select businesses and investors, including Vinmar International.

**HEXION SPECIALTY CHEMICALS, INC.,** Columbus, Ohio              **2005 to 2006**

*Executive Vice President and General Counsel* for a $5 billion Fortune 500 specialty chemical company with more than 100 chemical production facilities and 8,000 employees located in more than 20 countries, formed by the merger of four companies by private equity firm Apollo Management. Company's debt was publicly traded and subject to SEC filing requirements.

Served as company's chief compliance officer and managed legal, corporate secretary, and intellectual property functions with a staff of 25 professionals in 6 countries and a budget of $12 million.

- Key participant in merger and integration of legacy chemical businesses into Hexion Specialty Chemicals.
- Completed major acquisitions: Akzo Nobel's $250 million ink and adhesive resins business; Rohm and Hass' wax compounds business; Rhodia's $180 million coatings and adhesives business.
- Prosecuted trade secret litigation to favorable $157 million jury verdict.

**RESOLUTION SPECIALTY MATERIALS/**
**RESOLUTION PERFORMANCE PRODUCTS**, Houston, Texas            **2001 to 2005**

*Senior Vice President, General Counsel and Secretary* for combined $2.1 billion enterprise, a leading global supplier of specialty chemicals, with 3,000 employees and manufacturing facilities and sales activities worldwide. Company's debt was publicly traded and subject to SEC requirements.

Served as chief compliance officer and managed legal, corporate secretary, and intellectual property functions with a staff of 12 professionals in the U.S. and Europe and a budget of $6 million.

- Developed legal and compliance functions from the ground up for both Resolution companies.
- Key participant in acquisition and integration of former division of Shell Chemical, capitalizing on significant cost-saving and revenue-generating opportunities.
- Key participant in acquisition and integration of Eastman Chemical Company's $800 million resins, inks and monomers businesses.
- Merged Resolution companies into Borden Chemical to form Hexion Specialty Chemicals, Inc.

- Selected as the General Counsel for Hexion in recognition of superior performance.

**MARK S. ANTONVICH**                                                                                       **Page 2**

**ENRON GLOBAL EXPLORATION & PRODUCTION INC.**, Houston, Texas                  **2000 to 2001**

*Senior Counsel* for Enron subsidiary engaged in global oil and gas exploration and production.

Engaged in domestic and international commercial transactions related to oil and gas operations in India. Supported exploration and new business development activities worldwide, including projects located in the United States, South Korea, Turkey and China. Participated in sale and closure of business prior to accepting position as General Counsel of Resolution Performance Products.

**BHP MINERALS**, Tucson, Arizona and Houston, Texas                                    **1995 to 2000**

*Senior Corporate Counsel* for one of the world's largest multinational minerals companies (oil and gas, copper, gold, silver, diamonds, lead, zinc, coal, iron ore) with annual revenues exceeding US$20 billion and operations in the US, UK, Australia, Canada, Chile, Peru, Venezuela, and Papua New Guinea.

Responsible for senior level operational and transactional activities, including:

- Completed carve-out and turnaround of Magma Copper Company from Newmont Mining, with successful $2.4 billion sale by private equity firm Warburg Pincus to BHP Minerals, creating world's largest privately-owned copper company, BHP Copper Inc.
- Acquisition of rights to the world's largest undeveloped copper/cobalt project in the Democratic Republic of Congo.

**PRIVATE LAW PRACTICE**, Washington, D.C. and Tucson, Arizona                       **1987 to 1995**

*Associate*  Specialized in all forms of real estate transactions and development, including land use and zoning approvals at **Patton Boggs** (1985-1987), **Dunnells Duval** (1987-1989), **Lerch Early & Brewer** (1990-1994), and **Streich Lang** (1995).

**GOVERNMENT SERVICE,** Washington, D.C.                                               **1982 to 1985**

*Legislative Aide to Senator Christopher J. Dodd,* 1983 to 1985

*Analyst, U. S. Department of the Treasury*, Washington, D.C., 1982 to 1983

# EDUCATION

**J.D., GEORGETOWN UNIVERSITY LAW CENTER**, Washington, D.C., 1988
Dean's List
Member, The Harrison Institute (Class Honors 1986-87)
University of Notre Dame International Law Program, London, England, Summer 1985

**B.A., SOUTHERN CONNECTICUT STATE UNIVERSITY**, New Haven, Connecticut, 1982
Dean's List
Tau Pi Sigma (College Honors Fraternity)
Speaker of the House, Connecticut Intercollegiate Student Legislature

**MARK S. ANTONVICH**  **Page 3**

## PROFESSIONAL ACTIVITIES

Texas General Counsel Forum – Board of Directors of Houston Chapter and Statewide Organization
SMU Cox School of Business – Institute for Leadership in the Law (2006)
Georgetown University Alumni Association (Houston Chapter)
United Way – Young Leaders
World Affairs Forum (Houston Chapter)

## COURT ADMISSIONS AND BAR ASSOCIATIONS

United States Supreme Court
Supreme Court of Arizona
Court of Appeals of Maryland
Supreme Court of Texas
Supreme Court of Ohio

## AREAS OF EXPERIENCE AND RESPONSIBILITY

### CORPORATE

**Capital Markets and Securities Law**   Carried out numerous debt and equity transactions, including private placements, exchange offers, and public offerings. Prepared periodic SEC reports (10Q, 10K, 8K) for Resolution companies and Hexion, whose debt was publicly traded. Negotiated multiple bank credit agreements and bond indentures, drafted disclosure documents, and coordinated due diligence efforts. Debt deals included:

- $328 million of senior subordinated notes
- $53 million of senior subordinated notes
- $175 million of senior second secured notes
- $140 million of senior secured notes
- $150 million revolving credit facility

**Corporate Governance and Secretary**   Managed board and shareholder meetings and related activities for Vinmar, Hexion and Resolution companies. Established corporate disclosure committee and developed Audit Committee review procedures for financial reporting and Sarbanes-Oxley 404 compliance. Provided the board and senior management with the guidance and tools to manage the business and affairs of the company in accordance with the requirements of the SEC and Sarbanes-Oxley and otherwise in accordance with best practices. Administered stock option plan.

**Corporate Compliance**   Drafted and implemented Code of Conduct and all corporate policies, guidance and training materials, including: financial reporting, antitrust, export compliance, internal controls, international operations, FCPA, money laundering, conflicts, insider trading, and records management. Instituted global interactive compliance training to all employees. Provided in-person FCPA training in such locations as Nigeria, Dubai, Turkey, China, India, Mexico, Brazil and similar high risk venues.

**Investor Relations**   Worked closely with Investor Relations department to ensure the timely and accurate disclosure of all information released to the market (including compliance with regulation FD). Reviewed and approved all press releases.

### TRANSACTIONAL

**Mergers, Acquisitions, and Divestitures**   Representative transactions include:

- $250 million acquisition of ink and adhesive resins business from Akzo Nobel
- $180 million acquisition of coatings and adhesives business from Rhodia
- $800 million acquisition of resins, inks and monomers business from Eastman Chemical
- $900 million acquisition of epoxy resin and versatics business from Shell Chemical

**Commercial Law**   Drafted and negotiated all types of commercial agreements, including product sales and purchases, distribution, product exchange, tolling, capacity rights, sale-leaseback, information technology, corporate mergers, stock and asset acquisitions, divestitures, joint ventures, real estate, intellectual property, licensing, engineering, construction, production sharing, operating, and related due diligence.

**International Law**  Supported international corporate and business manufacturing operations; developed trade law strategies; engaged in acquisitions and divestment transactions in over 30 countries on 6 continents for Vinmar, Hexion, Resolution, Enron, and BHP.

## INTELLECTUAL PROPERTY

Managed worldwide patent and trademark portfolio (over 3,000 patents and applications) to achieve cost savings and align with business strategy.  Engaged in technology licensing transactions to monetize non-strategic portfolio.

## LEGISLATIVE / REGULATORY

**General**  Formulated and executed legislative and regulatory solutions at the local, state and federal levels of government on tax, health and safety (OSHA/MSHA), environmental (RCRA/CERCLA/TSCA/CAA), international trade (Import/Export/Antidumping), and other regulatory issues.  Developed and maintained relationships with agency and elected officials to further company objectives.

**Environmental Health and Safety Law**  Advised on the environmental impacts of company manufacturing operations, participated in permitting activities, and developed compliance strategies for all environmental mediums, including management system design and implementation.  Successfully recovered indemnity claims from predecessors.  Directed complex environmental litigation and crisis management efforts.  Delivered paper on handling mining disasters to the International Bar Association in Barcelona, Spain.

## LITIGATION

**General**  Managed hundreds of litigation matters, including: misappropriation of trade secrets, asbestos, product liability, accident and injury claims, contract disputes, property issues, labor relations, and employment matters.  Also managed complex environmental litigation, such as Superfund and insurance recovery matters.  Developed cost-effective litigation strategies, engaged in all forms of alternative dispute resolution, and devised innovative settlement solutions.

**Internal Investigations**  Conducted several internal investigations of employee malfeasance, including embezzlement and misappropriation of company assets and trade secrets.

**Criminal Investigations**  Managed civil and criminal investigations involving alleged violations of the export control laws, Foreign Corrupt Practices Act, commercial bribery, money laundering, and bank fraud.

## EMPLOYMENT AND LABOR

Handled immigration matters and EEOC and other personnel issues including claims related to sexual harassment, equal pay, and gender, age, and race discrimination.  Negotiated employment and severance agreements.  Managed union-related legal issues.

## CERTIFICATE OF SERVICE

I Deborah R. Gross hereby certify that on May 10, 2010, a copy of Lead Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Final Approval of the Settlement and For an Award of Attorneys' Fees and Expenses was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.


_____ /s/ Deborah R. Gross_____
**DEBORAH R. GROSS**


Deborah R. Gross
**LAW OFFICES BERNARD M. GROSS, P.C.**
Suite 450, John Wanamaker Building
100 Penn Square East
Philadelphia, PA   19107
Telephone:  215-561-3600
Facsimile:  215-561-3000